The Honorable the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. This is Chief Judge Howard speaking. I want to welcome all counsel to today's proceedings and Judge Barron and I would also like to welcome Judge Singal from the District of Maine back to the Court of Appeals and thank you Judge Singal for helping us out. My pleasure. Clerk may call the first case. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. David Maglio appeal number 20-1359. Attorney Allen please introduce yourself for the record and proceed with your argument. Yes, good morning, Your Honors. May it please the Court, Ashley Allen for the appellant Mr. David Maglio. I would like to reserve two minutes for rebuttal at this moment. Yes. Thank you. There are three issues on appeal here today. Each issue however stems from and concerns the search warrant affidavit of Hull Police Sergeant Craig Leporeau which was submitted for the search warrant to search Mr. Maglio's home. Three issues are whether Mr. Maglio was entitled to an affidavit on the search warrant, whether he was entitled to a hearing pursuant to Franks v. Delaware based on the numerous omissions and misrepresentations contained within the warrant, and third whether a reformed affidavit establishes probable cause. Going first to the evidentiary hearing on the motion to suppress. There are two issues that the court should have allowed an evidentiary hearing on the motion to suppress. Facts that were in dispute that are material to probable cause. The first issue is to determine whether or not the marijuana that the informant was caught with in Danvers, Massachusetts was the same marijuana that was left at the informant's residence on a previous search just two days prior or whether that marijuana came from Mr. David Maglio's basement as suggested by the warrant. A second is whether the one instance of surveillance and the instance of cooperation for the informant's statement was a warrantless search on the cartilage of Mr. David Maglio's home. Now going into the surveillance portion, the warrant stated that Mr. Craig Leporeau was 50 feet from the property at the time of the search when he smelled the pungent odor of marijuana. However, the deed to the property show that that was nearly impossible for Mr. Craig Leporeau to be standing 50 feet from the property when he smelled the marijuana. Now the judge in the lower court determined that it's a reasonable inference but it's not a necessary inference. But that's not the question here. The question here is whether or not there was a warrantless search and whether or not the magistrate judge who issued the warrant was improperly misled into believing that this was a proper search. And second, if it was a proper search, whether or not he misled the warrant issuing judge into where his location was. That matters because when he says that he's only 50 feet away and he smells this marijuana, the question becomes, was there other houses around? Was he 50 feet away from the property line or was he 250 feet away from the house? If you look at the record appendix and the deed at Joint Appendix 393, it shows that the property line is within, is a hundred feet from certain residences. It's also located on the coast where it's windy and is within distance to many, many other houses. So that portion there really goes to whether or not he smelled the marijuana and was it coming from Mr. Maglio's property as it so clearly states. This is also material to probable cause because every other instance in which the Hope Police Department came into contact with 83 Main Street when there was a car accident and one of the Hope Police officers walked up the driveway, as well as when they observed vehicles on numerous occasions, not once was it ever mentioned that the smell of marijuana was ever observed. So you had a Hope Police officer who's standing in the driveway next to the home of Mr. Maglio and does not smell marijuana. But on the one instance of surveillance in January, now all of a sudden Hope Police Sergeant Craig LaFroze states that he is 50 feet from the property and can smell the pungent odor. And those two issues, really, if they come down into Mr. Maglio's favor, then that was material to probable cause and his motion to suppress should have been allowed. But there was no hearing in this case. Just on that point, if I understand it, if we just strike everything that you want to have struck from the warrant application, the affidavit, isn't there still a basis for concluding that the informant Albuquerque had been in the basement and seen the marijuana grow? I don't agree with that because that goes directly towards the cooperation, the surveillance. He doesn't state, I was in the basement and I saw this stuff. He says that Mr. Maglio has a grow worth tens of thousands of dollars. He does not specifically state that he saw these things. He was in the basement. He also says he's been in the basement. He doesn't say that he was in the base. He says that he makes a statement of fact that, at least in his mind, that Mr. Maglio has these things in his basement and described. I thought he said that he observed at least a weapon in the basement. He said that, I apologize, he says that he observed, no I'm forgetting, multiple fire, he described one firearm. Isn't it a fair reading of the warrant affidavit application that the there was a marijuana grow in the basement, that the drugs he had came from that marijuana grow, and that he had been in the basement? Aren't those three things all fair conclusions to draw from the affidavit? I think it's a far cry from the cases where they say that we can say that this is absolutely personal knowledge. Anybody can say that this person has this stuff and they observed these firearms. It is one inference, but it's not the end-all be-all. I also think with this specific informant, there are so many reasons to doubt his credibility, especially when you consider all the lies that Craig Lepreau told within the warrant, that we now have to look at whether or not the the probability of a lying informant has been sufficiently reduced. That's where this information about whether or not there was a legal search on his property, and whether or not this pungent odor of marijuana comes in or is excised from the warrant, because it's the very limited cooperation that Craig Lepreau did. So, for cooperation, we have, yes, that Mr. Magalio lives at 83 Main Street, which is no big surprise. This is 83 Main Street, is the address that Mr. Magalio told the Commonwealth that, hey, this is where I'm going to be growing marijuana. He registered that address with the Commonwealth as his cultivation address, so it's expected that he was going to be growing marijuana there. He told the Commonwealth of Massachusetts that, I'm going to be growing marijuana here. And second, that the electricity records are also called into doubt. So, that's a second thing of cooperation is Craig Lepreau says, well, look at these high electricity records. Well, if we really consider the high electricity records, we also have to consider the note that was left on the records that questioned whether or not the reads were good on the meter. And second, that this property was vacant for three years. I guess the question I'm asking, again, if you, I'm agreeing with you, let's imagine we strike that. I guess I'm not quite hearing your answer to just reading the affidavit. There's a statement that at 83 Main Street, there's a grow of this size, which is problematic size from your perspective, and that the person representing that was in the location, inside the location, where that grow of that size existed, and that he had marijuana from that grow. All those three things, as I'm hearing you, you're not saying any of that gets struck. You're saying that if that's all there is, there still was a need for a Frank Searing. Is that right? Yes, and if I just may, I understand I'm running out of time, if I could just answer that question briefly. I agree with you that if that was the case, that everything is struck besides that information, it is not enough to carry the day, especially when you consider his indicia of unreliability, that this is a person that was recently arrested, that was caught with his own marijuana grow. He had 130 Grove Street, and he had a reason to lie. He had a motive to lie to in order to take the blame off of himself, and it's a classic. It's not mine, it's his statement. Do you believe that it's only a coincidence that an automobile accident, where your client is a passenger in a car at the property, is driven by an individual who gives his address as the marijuana laboratory that Mr. Albuquerque discussed? Is that a bizarre coincidence? Is it coincidence? By the way, you did not argue about the kilowatt-hours, you argued about the dollar amount of the bill. I don't see that the kilowatt-hours were disputed at all, and the kilowatt-hours indicate ten times the amount of kilowatt-hours when the house is empty, and much higher than in kilowatt-hours in any other house. Do I agree with the kilowatt-hours? The issue with what Craig Lepreaux did in that circumstance is he compared all the comparison homes with monetary amounts, so the kilowatt-hours were high, yes, but they were high in the house before anybody was even living there for the three years prior. Ten times during the time that the detective says that's a marijuana grow, and he says why it increases and then drops is because more electricity is needed to build it to a full height, and then it drops. Right, and I think that Craig Lepreaux's opinions on that matter is given less weight given his evaluation of records that he was basing those on an improper reading of those records, and on top of it we have a house here who has, there's a question about whether or not those reads are correct given the note on the electricity records, a house that was consuming more than the average amount that was typical for a house in Hull when people were occupying it versus a house that's unoccupied. He said it was 750 kilowatt-hours in the average use of monthly for Hull. Here we have over a thousand being used in the three years prior when it's empty, and I apologize, your first question I don't think I've answered. If you could please repeat it. My first question has regard to the fact that the driver of a car at the property where Mr. Maglio is a passenger lists his address at 130 Grove Street, which is the extraction laboratory, exactly the same address as the extraction laboratory where Mr. Albuquerque is saying that your client is selling his marijuana so it can be, the active ingredients can be Mr. Maglio and Mr. Albuquerque. Mr. Albuquerque also didn't make up a person named David Maglio who lives at 83 Main Street. I think we all can agree that that was something that they did cooperate, that he lived at 83 Main Street. However, Mr. Gruen, who had the address of 130 Grove Street, this was in November, and when Albuquerque was arrested in January, he stated that he was selling his marijuana at 130 Grove Street, which is the extraction laboratory, exactly the same address as the extraction laboratory where Mr. Albuquerque is saying that your client is selling his marijuana so it can be, the active ingredients can be, the active ingredients can be Mr. Albuquerque. However, Mr. Maglio, who had the address of 130 Grove Street, this was in November, and when Albuquerque was arrested in January, he stated that he was the only person living there. He had been living there on and off for that past few months. So it's very possible that Daniel Gruen lived there prior to Albuquerque. But I don't think that that shows that Mr. Maglio was involved in some sort of scheme in his own home. And that does not get you into Mr. Maglio's home because he is around somebody who has a similar address. If anything that maybe gives Mr. Albuquerque a reason to have made something up, I think that that's a good thing to do. And he's a very good guy. He's a good guy. He knows how to set things up and does know, at least the characters that are at play here. Let me hold you there, counsel, and ask whether there are additional questions at this time from the court. All right. You have reserved some time. And if you would mute your audio and video, we will hear from Mr. Crom. Hello. This is Randall Crom on behalf of the government. May it please the court. The government believes the district court did properly deny the motion to suppress and for a Franks hearing and probably denied motion to suppress without having an evidentiary hearing without restating everything in the government's brief. Just briefly to state the as the court has noted, only a few statements were directly called into question in terms of what Mr. Albuquerque said. Much remains of what he said that does lay out a situation in which he is talking about personal knowledge and describing in some detail what he observed in the basement. That is enough under this court's precedent to establish some indicia of reliability for the statements that were made because of the level of detail, including the description of a gun that was somewhat specific enough to deny describing the type of the gun. This court hasn't held that the statements need to be an exhaustive litany of detailed facts in order to pass the reliability threshold. And in here you have a named individual, not an anonymous tipster, giving an account based on personal experience that is somewhat detailed. And you in addition have information, which is the district court found would have actually been heightened by further information about the THC lab search, explaining the basis of his knowledge. He was connected to a THC laboratory and therefore it is understandable why he would be a person who would be in the basement of a person growing marijuana. That was information was not only inherently reliable in that way, but was corroborated in a number of ways, including the electrical records, the detection of an odor of marijuana. The criminal history, including a pending case involving the same defendant at another large marijuana grow. And as the court has noted, the somewhat hard to explain otherwise connection between the person who was driving the car at an accident in front of the house and the THC lab made all the more suspicious by the fact that the person that Maglio at the time then refused to let the police investigating the accident come onto his property. I don't know that this ultimately matters or affects the outcome of the case. But one thing I was confused by in the district court's ruling, it says on page eight of the affidavit, LEPRO made a statement concerning the cooperating witness Albuquerque, which the government acknowledges is false. And that statement that they say is false is Albuquerque has provided reliable information to law enforcement resulting in discovery of a THC lab and the prosecution of offenders. It says this statement was not true. It was either knowingly false or reckless. It says Albuquerque lives at 130 Grove Street, Roxbury. He was involved in a fight there. And then it says, however, the court notes that if the accurate information about Albuquerque were included, the affidavit would that he would have said that he lived in a location with an extraction lab. But I can't tell whether the district court is saying that it's correct and accurate information, which I understood to be not what you're supposed to do. Well, I think he's the what he seems to have understood the defendant to be arguing is there was a reckless omission as to the true facts of the discovery, as well as a reckless false statement in terms of describing another sequence of events in which he provided information that led to the search. So he understood the defendant's argument to be there's both an omission here and false statement. Just walk me through that part of it, just so I understand how to think it through. You agree that when there's a false statement, you just strike it. You don't correct it with true information. Correct. Right. I mean, I understand to be that you strike the false statement. Yes. So just for this passage, just help me understand the false statement is what? And we'd strike that. What is the reckless omission according to the district court that is leading it to add something back in? And what's that? I'm just not following that passage of the district court's opinion. Well, yes, your honor, I my understanding was that, like I said, the defendant was also making an argument. Oh, I think maybe I'm cutting out a little bit. I don't know if it's just for me, but I can you hear me? All right. Why don't we pause the record? I can hear you. Yeah. So. So again, I don't know if I can say more than I did about what the district court's thought process was. What I understood it is that it took there to be an argument by the defendant that the true state of affairs of Albuquerque's involvement would were recklessly omitted. And then that was also relevant to the Frank's request and that he was responding to that aspect of it by saying those facts would have been were not material because, in fact, helpful to the government. So there was there was the false statement about what what Albuquerque provided. But they were saying a reckless omission as to the true state of affairs. And without looking back, I'm not sure how accurate that assessment of the district court was as to the omission. But I do believe that the defendant argued that information was omitted as to the true state of affairs and that that was part of its Frank's request. Do you think it important here how the informants tip was taken? We know that it's relevant whether the the informant is talking firsthand to the person making the request for a warrant or secondhand here. It's a second hand. The the affidavit on the search warrant didn't get the information directly from the informant. Do you think that's important, especially when the when the judge below found that a reckless or intentionally false statement was made? Well, I think it does. It has something to do with how we assess the tip as part of the context of the tip. And so in one sense here, because it's secondhand, that deprives the person, the affidavit from the ability to comment directly on the demeanor of the person providing it. It doesn't take away all of the industry responsibility of reliability, including the detailed nature of the tip or other information that this court has relied upon that it's firsthand account. But it certainly does take away something from it. On the other hand, I would note that it also in that sense, it also you lose the ability to get some of the detail, perhaps that might have been helpful to the government. So this is a situation where when it's secondhand, that's part of the context of the tip. But there's certainly, we would say, enough in it that was recorded in terms of the detail of the firearm and that kind of thing to make it over that hurdle to where we again look to corroboration. And I don't think that ultimately changes. I mean, we take the tip as it is without the ability to assess the demeanor of the person giving it. And we still have enough in the government's view with the corroboration that was made. How significant do you think that Albuquerque was previously convicted for forging checks, an offense involving dishonesty? That is certainly a relevant factor. And I think, you know, as this court has said, and, you know, it's not doesn't deprive it of all possibility of being reliable, but it is one factor that weighs against it. And that's why I think it's helpful in this case that we do have. I mean, we're not relying. I think this is important. We're not relying on this as an inherently reliable tip that by itself establishes probable cause. But we're establishing it as one that counts in the mix because it has enough to look at then the corroboration and everything and to be included. This court certainly has noted that the facts of dishonesty is relevant, but it hasn't held that that gives it no weight whatsoever. And here that was certainly a relevant consideration. But there was many of other matters discussed in the briefing here that supported its reliability. Suppose we said that the utility records in total. And the smell, the odor of marijuana were each properly. We should discount them, not include them, not consider them. What is your understanding, then, of what the best authority you have is for the idea that even with all that gone, the information in the affidavit would be enough and the corroboration would be enough so that there was no need for Frank's hearing. I'm not sure I can point you to authority in the sense of a case that's just like that, because I wasn't necessarily looking for excluding both of those which we consider were properly allowed to count by the district court. But we do have, as been noted, the criminal history of Maglio, and that's a very significant. We have both. OK, so what was said about by the Albuquerque, including the parts that make it detailed and explain the basis for knowledge. And then we also have a criminal history, which includes a marijuana grow. Just one year earlier, the arrest was for a marijuana grow in Rutland, Massachusetts, just a year earlier, as well as numerous criminal convictions. And then, in addition, we have this strange connection to a place that has been discovered to be a THC processing laboratory and the suspicious behavior where he's essentially not allowing police investigating an accident in his own driveway to come onto his property. The government would argue that was enough, even if you take out those other two pieces, although we certainly believe they should have counted. I think it's also worth noting, although the district court didn't rely on it to go this route, other than to mention it. But apart from all the marijuana evidence, there was specific evidence of firearms and felony convictions that would made him unable to have firearms. And so one could argue that much of this could drop out and you would still have basis for a search to find the firearms in the duffel bag in the basement, which were specifically described in which he could not legally possess. But that is the district court did not go that route. Instead, relying on the corroborated information, relying on marijuana. Thank you, Mr. Crom. If you would mute. Ms. Allen, you have reserved two minutes. Thank you, Your Honors. I just want to briefly address Your Honor's question regarding the secondhand nature of the tip. There are three points to that. Now, we have a sergeant here, Craig Leporeau, who twice in this warrant, he didn't just misrepresent what was stated in a police report. There were two written police reports that he trapped in his warrant up until the information no longer became favorable to him. And that's the Rutland police report, as well as the Danvers police report. Now, these police reports stated very clearly two specific facts, one being the medical marijuana certification and the other one being that this was a that Albuquerque did not reveal a THC lab or anything of that sort, that this was a plain due nature. And that Leporeau claims that it led to the prosecution of offenders. The only person prosecuted was was Mr. Albuquerque, nobody else. And so, you know, we have somebody here who's willing to take these two written police reports and completely misrepresent them to a magistrate under oath. And now we're supposed to believe that he received a secondhand tip from a deputy, from a jailhouse informant, and he properly represented that to the court. So I do think that that is very relevant to the evaluation here in the totality of circumstances as to what length Mr. Leporeau was willing to go in order to secure the search warrant. And second, it also comes down to this is not a victim of a crime. This is not somebody who is a concerned citizen whose story may be more easily accepted. And he was not inculpating himself. I mean, he was. This is a classic. It's not mine. It's his. Excuse me. Isn't he inculpating himself for conspiracy? He's saying that he has a connection to this huge marijuana grow. Isn't he? Isn't he saying I'm guilty of this crime and giving evidence against himself? This is when he's sitting. He's already arrested for having 13 pounds of marijuana on him. So at this point, he's already spoken to the police while he was at Danvers. He admitted that these mail plants were his. Once he's speaking with Deputy Campbell, he's already stated that this was his stuff. Now he's saying this isn't mine. Take back what I said to the Danvers police. This isn't mine. This is Mr. Maglio's. So he's not saying he purchased this from him, that he was involved in the scheme. He's saying that this doesn't belong to me, throws his hands up. So I don't agree that this is something that is the classic inculpating himself. And when it comes to the manner in which he provided the tip, there is no incentive for him to tell the truth. He's already been arrested. He's being held responsible for the Danvers stuff. He's trying to get out of it. So the typical manner of the tip and why we can find those things reliable because we know the person who's providing the information hold them responsible doesn't really apply here. And third, what Vigne said was that even if there is some degree of cooperation, which would be if we were to still consider the smell as well as the electricity record, that doesn't excuse the omission of known unreliability. And here we have somebody who was arrested. He was arrested twice in January. And earlier in January, he was brought to Father Bill's shelter because he was out of it. He was found in a Hummer, slumped over, clearly on drugs. He had mental health issues. All of this stuff was in the warrant as to why we shouldn't believe him. And I forget which one of you brought it up, but Your Honor was correct in noting that this is somebody who does have prior convictions of dishonesty. And so when we consider all those things, it really paints a picture of who we're dealing with here. This is not somebody that's trying to be the concerned citizen or is a victim of a crime. This is somebody who's trying to get out of what he's in jail for already. And those things should be considered in evaluating the circumstances and whether or not this person was reliable and that Sergeant Lepper established that. Thank you, Counsel. Thank you, Your Honors. That concludes argument in this case. Attorney Allen and Attorney Crum, you should disconnect from the hearing at this time.